UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Crim. No. 04-54-B-W |
| | ) |
| STEVE BOUCHARD, | ) |
| LEO ROUSSEL, | ) |
| | ) |
| Defendants | ) |

**RECOMMENDED DECISION ON MOTIONS TO SUPPRESS**

Defendants Steve Bouchard and Leo Roussel have separately filed motions to suppress (Docket Nos. 26 & 27) in connection with the tandem warrantless stops and searches of their individual motor vehicles in Monticello, Maine on July 8, 2004. The Government justifies these stops and searches on the basis of probable cause and alternatively, consent. Because I am satisfied that the undisputed facts support a finding of probable cause justifying the warrantless search and seizure of these motor vehicles, I recommend that the court **DENY** the motions to suppress. As to the alternative basis of justifying this search, the record supports the need for an evidentiary hearing with the aid of interpreters in order to make the necessary findings as to whether or not the defendants consented to the search.[1] Because I believe that these stops and searches can be justified independently of any such consent, I have not conducted such an evidentiary hearing.

---

[1] Both defendants have filed affidavits setting forth their limited ability to understand and speak English. (Docket No. 30 & 44). All proceedings in front of me have been conducted through an interpreter and I have authorized the expenditure of funds for interpretive services to aid the defense. There is clearly a question of fact generated as to whether or not the officers obtained a valid consent to search the motor vehicle as to either defendant. The defendants have not challenged any of the factual allegations I have set forth in this recommended decision and I have ignored the challenged allegations relating to alleged conversations between the defendants and the officers in fashioning this recommendation.

*Statement of Facts*

In May 2004, Special Agent Bruce Gauthier received information from another law enforcement official who stated that Canadians were smuggling marijuana into the United States across the Maine border. The source relayed that these individuals would rent cars in Fort Kent and stay at a motel in Madawaska. On July 7, 2004, Special Agent Bruce Gauthier met with a confidential informant who relayed that several Canadian individuals with rental cars from Martin Ford would rent rooms at the Gateway Motel. These individuals would always pay cash. The rental cars would be left at the hotel sometimes up to a week even when the Canadians were not staying at the hotel. Special Agent Gauthier and others conducted surveillance on a gray 2004 Ford Taurus bearing Maine license plate number 7867LF and a tan 2003 Ford Windstar minivan bearing Maine license plate number 8654GC. Record checks revealed both vehicles to be rental vehicles owned by Martin Ford of Fort Kent, Maine.

At approximately 9:30 p.m. on July 7, 2004, Special Agents Bruce Gauthier and Donald Ardell observed both vehicles parked at The Gateway Motel in Madawaska, Maine. The vehicles were parked around the back of the motel and were parked side by side. On July 8, 2004, at approximately 1:05 a.m., Special Agent Ardell observed a white, heavy-set male with a beard exit a motel room and enter the Ford Windstar. Special Agent Ardell also observed a white male wearing a white shirt and a red baseball hat exit the motel room and enter the Ford Taurus. Special Agent Ardell observed both vehicles exit the motel parking lot together.

At approximately 1:10 a.m., Special Agent Gauthier observed the Ford Taurus and the Ford Windstar traveling southbound on U.S. Route 1. Both vehicles traveled

2

together for approximately ten (10) miles before turning into separate driveways which are across the street and just beyond the driveway to the residence at 606 Main Street, Grand Isle, Maine. The agents continued southbound and passed the vehicles to avoid detection. Approximately one quarter mile down the road, the agents turned around and drove northbound.

The vehicles were no longer visible. The agents then positioned themselves in separate vehicles north and south of this location. The driveway of the residence at 606 Main Street, Grand Isle, leads down to the St. John River. The International Border between the United States and Canada in Grand Isle, Maine, is the St. John River. In March 2004 two individuals were observed by United States Border Patrol (USBP) agents meeting with two unidentified individuals at the end of this driveway. Several duffel bags were observed being placed a vehicle. The individuals were later discovered in possession of approximately one hundred and thirty (130) pounds of marijuana packaged inside hockey bags secured with colored ties.

At approximately 4:10 a.m., Special Agent Gauthier, who was positioned approximately one tenth of a mile south of 606 Main Street, Grand Isle, observed the Ford Taurus and the Ford Windstar traveling southbound on U.S. Route 1 approximately one tenth of a mile from the point where they had last been seen. The two vehicles were followed for a distance of approximately 60 miles. During the time the vehicles were followed, they remained together with a one or two car length distance between one another.

At approximately 5:45 a.m. on July 8, Maine State Police were running radar on Route 1 in Monticello, Maine. Trooper Brian Harris observed a tan Ford Taurus

traveling southbound on Route 1, followed closely by a tan minivan. Trooper Harris activated his radar and clocked the lead vehicle's speed as 36-38 mph. The minivan was also traveling the same speed and was only 1 to 2 car lengths behind. Trooper Harris pulled out behind the minivan; he then activated his emergency lights, went around the minivan, and stopped the Taurus. Another trooper, Trooper Fuller then stopped the minivan.

      Trooper Harris approached the driver's side of the Taurus and could see a single male occupant/driver in the vehicle. Trooper Harris asked the driver for his license, registration and insurance and he was able to produce an insurance card and his New Brunswick picture license. From the license Trooper Harris identified the operator as Steve G. Bouchard, DOB 11-03-71, of St. Joseph, New Brunswick. Trooper Harris noticed that the insurance card was issued to Martin Ford in Fort Kent.

      While speaking to Bouchard, Trooper Harris noticed numerous apparently empty soda cans and a large amount of trash on the front passenger floorboard. Trooper Harris could also see a shirt hanging in the driver's side rear window and a black duffel bag on the back seat. Trooper Harris told Bouchard that Trooper Harris had stopped him for doing 38 mph in a 30 mph zone. Trooper Harris returned to his cruiser and wrote out a warning card for speeding for Bouchard and then returned to Bouchard's car.

      For disputed factual reasons, Bouchard got out of the car. Once out of the car Trooper Harris directed Bouchard to the side of the road, away from traffic and asked him to sit on the grass. Trooper Harris then proceeded to search the interior of the car. In his search, Trooper Harris located a black duffel bag on the back seat. Trooper Harris then looked inside the bag and saw a minimal amount of clothes but no toiletries or

shoes. In the front zippered part of the outside of the bag Trooper Harris noticed that there were several small bundles of different colored "zip ties ." On the front passenger seat floorboard there were numerous empty Pepsi soda cans, paper cups, cigarette packages and assorted trash, enough trash that the floorboard was not visible.

In the Ford Taurus model of vehicle the rear seats flip forward providing access to the trunk of the car. As Trooper Harris was searching the rear seat area of the vehicle Trooper Harris noticed that the pull-tabs for the rear seat backs were visible and Trooper Harris pulled on the tabs to look behind the seat. When the seat back was pulled forward, Trooper Harris immediately noticed a large black nylon bag behind the seat and the bag appeared to be full.

Trooper Harris then conversed with Bouchard, the substance of that discussion being much in dispute. However, even Trooper Harris's version concedes he received no clear permission to search the bag nor any real explanation as to what it might contain. Trooper Harris then used the key to open the trunk and upon doing so immediately noticed more black nylon duffel bags in the trunk, filling the trunk compartment. At that point Trooper Harris ended his search of the vehicle.

Trooper Harris then communicated with Special Agent Mark Sperry of MDEA and told him about the black hockey bags with colored ties that Trooper Harris had seen in the trunk. The bags were suspicious to Special Agent Sperry because of a previous marijuana seizure where the marijuana was packaged in hockey bags and colored ties were used to seal the bags. Special Agent Daniel Sanchez then arrived on the scene and he was informed of the hockey bags with the colored ties. Special Agent Sanchez agreed

with the significance of the bags with the colored ties.  Special Agent Sanchez opened one of the bags; inside was a large amount of marijuana.

The other vehicle was stopped at the same time.  Trooper Fuller activated his emergency lights and the van pulled over.  Trooper Fuller went up to the driver side window and observed that the vehicle had only one occupant.  Trooper Fuller asked to see his license, registration and proof of insurance. The operator gave Trooper Fuller his license and proof of insurance.  The operator was Leo Roussel, who produced New Brunswick License #694436, DOB August 4, 1962.  The van was registered to Martin Ford in Fort Kent, a rental vehicle.  Trooper Fuller observed Roussel's hands shaking and heart racing which Trooper Fuller could see through his shirt, and he was watching the vehicle ahead of them, which Trooper Harris had stopped.  Following a disputed conversational exchange, Trooper Fuller conducted a search of the van.  In the back seat was a duffel bag and in the very back was something that was covered with two blankets.  Trooper Fuller opened the back hatch of the van and lifted the blankets.  There were what appeared to be large black hockey styled duffel bags with wire ties attaching the handles, and a glue or silicon type substance where the zipper was closed and extending about 3 inches down the zipper.  The bags appeared to be full.  Trooper Fuller looked on one end of the bag where there was a vent hole and could see a clear plastic bag with what appeared to be Marijuana in it.  Trooper Fuller then turned everything over to Bruce Gauthier, an Immigration & Customs Enforcement Agent who had arrived on scene.

### *Discussion*

The First Circuit has recently summarized the law applicable to the warrantless search of a motor vehicle:

6

> The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Subject to limited exceptions, warrantless searches of private property are per se unreasonable. California v. Acevedo, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); United States v. Donlin, 982 F.2d 31, 33 (1st Cir. 1992). The mobility of automobiles and the attendant need to prevent loss of evidence undergirds one such exception. A warrantless search of an automobile will be upheld if "officers have probable cause to believe that the vehicle contains contraband." United States v. Ross, 456 U.S. 798, 808, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).
>
> The government bears the burden of proving the lawfulness of the search. Mincey v. Arizona, 437 U.S. 385, 390-91, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); United States v. Cruz Jimenez, 894 F.2d 1, 7 (1st Cir. 1990). Specifically, the government must demonstrate that law enforcement officers had "a belief, reasonably arising out of circumstances known to the seizing officer," that the vehicle "contain[ed] that which by law is subject to seizure and destruction," Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925). (footnote omitted). Our focus is on "what the agents knew at the time they searched the car," United States v. Goldman, 41 F.3d 785, 787 (1st Cir. 1994).

United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004).

To analyze whether probable cause existed to search these vehicles, the court must apply the "fellow-officer" rule. As the First Circuit recognized in United States v. Meade, 110 F.3d 190, 193-94 (1st Cir. 1997), under the "fellow-officer" rule, law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime. See also United States v. Ventresca 380 U.S. 102, 111, (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.").

Collectively the officers knew the following about these two vehicles prior to the search:

- They were rental vehicles from a Fort Kent automobile dealership;

7

- The sole occupant of each vehicle was seen at the Gateway Motel in Madawaska;

- The agents had received information from another law enforcement officer and an informant that Canadians who were smuggling marijuana across the border were renting cars in Fort Kent and staying in a motel in Madawaska;

- This vehicle was traveling in tandem with another rental car;

- Agents observed these vehicles at the border near a known marijuana smuggling point at 1:00 a.m.;

- A prior case involving marijuana smuggling at that same location had involved a large quantity of marijuana concealed in a duffel bag;

- The vehicles remained near the smuggling point for approximately three hours during the early morning hours (1:00 - 4:10 a.m.);

- After stopping the vehicles they learned the sole occupant of each vehicle was a Canadian citizen who, whether for language barrier reasons or because he was being evasive, could not provide reliable information about how he came to have custody of the rental car and where he was headed with it;

- While conducting the traffic stop Trooper Harris saw a black duffel bag on the back seat of the Taurus.

Given these facts known collectively to the officers involved in this matter, the officers had probable cause both to stop and ultimately to search this vehicle.

As a preliminary matter, the officers clearly had probable cause to stop these vehicles for a traffic violation because they were operating in excess of the posted speed limit. The defendants do not challenge that assertion. That the stop was pretextual seems

8

patently obvious, but the officers' subjective motivations are irrelevant. Whren v. United States, 517 U.S. 806, 813 (1996). Because the defendants' speed provided cause for the traffic stops, "the inquiry stops there." United States v. Andrade, 94 F.3d 9, 12 (1st Cir. 1996). See also United States v. Abernathy, 83 F.3d 17, 19 (1st Cir.1996) (officers on undercover investigatory narcotics detail may lawfully make a traffic violation stop). Because the stops were valid traffic stops, the officers' observations made while they completed their initial inquiries to prepare the warning cards for the speeding infractions are properly part of the probable cause calculus.

The totality of the circumstances would have led any reasonable person to believe that criminal activity was afoot. The officers had received information from an informant that was corroborated by the events they saw unfolding in front of them. Two Canadian men with rental cars staying at the Gateway Motel proceed to a known drug smuggling point in the middle of the night. They remain somewhere in the vicinity of that drug smuggling location (a desolate location on the banks of the St. John River) for approximately three hours. They then proceed south, traveling in tandem, for approximately 60 miles. After the vehicles were stopped, one of the operators appeared visibly unnerved. In the other vehicle the officer saw a black duffel bag sitting on the back seat. When all of these facts are taken together, given the totality of the circumstances they support a finding of probable cause to search the motor vehicle.

### Conclusion

Based upon the foregoing I recommend that the court **DENY** the motions to suppress (Docket Nos. 26 & 27.) Furthermore, in the event the court determines that it is

necessary to make a determination vis-à-vis the issue of consent, an evidentiary hearing should be held.

## NOTICE

    A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

    Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

                /s/ Margaret J. Kravchuk
                U.S. Magistrate Judge

Dated November 8, 2004