UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | Crim. No. 04-54-B-W |
| | ) | |
| STEVE BOUCHARD and | ) | |
| LEO ROUSSEL, | ) | |
| | ) | |
| Defendants | ) | |

**SUPPLEMENTAL RECOMMENDED DECISION**

This Supplemental Recommended Decision on the defendants' motions to suppress (Docket Nos. 26 and 27) is entered in response to the court's order (Docket No. 51) remanding this case to me in light of objections that were filed in response to my initial recommended decision first entered on November 8, 2004, and remanded to me on December 21, 2004. The court returned the case to me with the following instruction:

> It is unclear to this Court whether there are critical facts in dispute and, therefore, this case is REMANDED to the Magistrate Judge so that she may (1) clarify the basis for her conclusion that the facts were undisputed; (2) hold an evidentiary hearing, if she deems it necessary; or, (3) provide an alternate means by which the parties may identify and present the facts.

Following the Order of Remand I immediately set this matter for hearing on the first available date, believing at that time the fastest and most efficient use of judicial resources would be to schedule a full evidentiary hearing on the issue of consent <u>and</u> what I still believed to be the "undisputed" facts surrounding the officers' probable cause determination. I scheduled the hearing for December 29, 2004. The Government moved to continue without objection. (Docket No. 54.) I reset the hearing for January 19, 2005. Again the Government moved to continue the hearing. (Docket No. 57.) The defendants

requested that the hearing not be reset during the week of January 24. (Docket No. 58.) The motion hearing was reset for February 3. On February 2, 2005, the courtroom clerk informed me that the telephonic interpretive services normally used by the magistrate judge were not available for purposes of evidentiary hearings as long in duration as this hearing was anticipated to be. The courtroom clerk also learned that one of the local French interpreters who the court frequently uses had been retained by the defense as an expert witness. Finding myself in disarray regarding the availability of a court interpreter and a court reporter for the next day's hearing, I continued the hearing on my own order. I then issued a procedural order to all counsel to provide the court with the names of potential witnesses and an estimate of the length of the anticipated hearing. In order to better assess the scope of the anticipated hearing, I requested that all three counsel file affidavits indicating what facts they contested or disputed in my original recommended decision.

The Government responded to my Procedural Order by filing a response indicating that it did not disagree with any of the facts recited in my original order. (Docket No. 70.) The Government also filed detailed affidavits from three officers indicating their versions of the events surrounding the searches of these vehicles. (Docket Nos. 71, 72, & 73.) Sometime later the Government filed a fourth officer's affidavit. (Docket No. 80.) Counsel for both defendants responded as well. Attorney Stephen Smith representing Bouchard indicated by affidavit (Docket No. 68) that the only *fact* that he had an evidentiary basis to dispute was the fact pertaining to his client's ability to understand English, a fact which I treated as disputed in the original recommended decision. Attorney Christopher Largay, representing Roussel, indicated that he intended

to call numerous fact witnesses on the question of Roussel's ability to understand English and to consent to a search of the vehicle.  In his affidavit (Docket No. 65), Roussel's counsel indicated that he had no evidence about the facts recited in the original recommended decision but intended to cross-examine the officers about such issues as whether or not they *really* relied upon information from a confidential informant.

When I attempted to reschedule this matter for evidentiary hearing, I again encountered scheduling difficulties, but ultimately an evidentiary hearing was held on March 22, 2005, and continued on March 25, 2005.  I now recommend that the court adopt the following proposed findings of fact, developed from the testimony at that evidentiary hearing and the officers' affidavits, and **DENY** the motions to suppress.

## Proposed Findings of Fact

In May 2004, Special Agent Bruce Gauthier received information from another law enforcement official who stated that Canadians were smuggling marijuana into the United States across the Maine border.  The source relayed that these individuals would rent cars in Fort Kent and stay at a motel in Madawaska. (Gauthier Aff. ¶ 2.)  On July 7, 2004, Special Agent Bruce Gauthier met with a confidential informant who relayed that several Canadian individuals with rental cars from Martin Ford would rent rooms at the Gateway Motel.  These individuals would always pay cash.  The rental cars would be left at the hotel sometimes up to a week even when the Canadians were not staying at the hotel. (Gauthier Aff. ¶ 3.)  Special Agent Gauthier and others conducted surveillance on a gray 2004 Ford Taurus bearing Maine license plate number 7867LF and a tan 2003 Ford Windstar minivan bearing Maine license plate number 8654GC.  Record checks

revealed both vehicles to be rental vehicles owned by Martin Ford of Fort Kent, Maine. (Gauthier Aff. ¶ 4.)

At approximately 9:30 p.m. on July 7, 2004, Special Agent Bruce Gauthier observed both vehicles parked at The Gateway Motel in Madawaska, Maine. The vehicles were parked around the back of the motel and were parked side by side. (Id.) On July 8, 2004, at approximately 1:10 a.m., Gauthier observed both vehicles exit the motel parking lot together. (Id.)

At approximately 1:10 a.m., Special Agent Gauthier observed the Ford Taurus and the Ford Windstar traveling southbound on U.S. Route 1. Both vehicles traveled together for approximately ten miles before turning into separate driveways which are across the street and just beyond the driveway to the residence at 606 Main Street, Grand Isle, Maine. The agent continued southbound and passed the vehicles to avoid detection. Approximately one quarter mile down the road, the agents turned around and drove northbound. (Id.) The vehicles were no longer visible. Gauthier then positioned himself approximately one-tenth of a mile south of the driveway; other agents were stationed in separate vehicles north of this location. (Id.)

The driveway of the residence at 606 Main Street, Grand Isle, leads down to the St. John River. The International Border between the United States and Canada in Grand Isle, Maine, is the St. John River. In March 2004, two individuals were observed by United States Border Patrol (USBP) agents meeting with two individuals at the end of this driveway. (These individuals are now identified as Verna Haney and Linda Fortin.) Several duffel bags were observed being placed in a vehicle. The individuals were later discovered in possession of approximately 130 pounds of marijuana packaged inside

4

hockey bags secured with colored ties. (Gauthier Aff. ¶ 5.) The driveway at 606 Main Street goes right down to the St. John River where there is a makeshift boat launch.

At approximately 4:10 a.m., Special Agent Gauthier observed the Ford Taurus and the Ford Windstar traveling southbound on U.S. Route 1. Agent Dan Sanchez assisted Gauthier with the surveillance as the vehicles proceeded southbound. The two vehicles were followed for a distance of approximately 60 miles. During the time the vehicles were followed, they remained in line with a one or two car length distance between one another. (Gauthier Aff. ¶ 6.) In Monticello, Maine, the vehicles were stopped by the Maine State Police. (Gauthier Aff. ¶ 7.)

Donald J. Ardell, a Senior Special Agent with the Department of Homeland Security, United States Immigration and Customs Enforcement (ICE), assisted with the surveillance at the Gateway Motel and the later surveillance of the area in the vicinity of 606 Main Street in Grand Isle. (Ardell Aff. ¶¶ 1 -4.) In connection with the 606 Main Street surveillance, Ardell's position was approximately one mile north of the driveway where defendants were last seen with their vehicles. (Ardell Aff. ¶ 5.) From this vantage he could not see the driveway to 606 Main Street, but would be able to see any vehicle that came north of that location on Route 1 (Main Street is Route 1). Ardell parked his vehicle in the parking lot of Frenchy's Restaurant, located on Route 1. Contrary to the information contained within paragraph five of his affidavit, there is a cross, east/west road, that intersects Route One between Frenchy's Restaurant and 606 Main Street. Agent Ardell was unaware of this cross street at the time he prepared his affidavit, but learned of it prior to the evidentiary hearing in this matter. Where Ardell was parked at Frenchy's it would have been possible for him to see the headlights of a car if it had

5

approached him and turned either to the right or left onto the crossroad prior to the restaurant. During the time period between approximately 1:00 a.m. and 4:00 a.m., while he remained in Frenchy's parking lot, Ardell did not see any vehicle with headlights on turning into the crossroad. The traffic was extremely light during that time of night and Ardell is sure that if a vehicle had turned he would have seen it. At approximately 4:10 a.m., Ardell received radio communications from either Special Agent Gauthier or Special Agent Sanchez that both vehicles had been spotted traveling southbound on Route 1. He then departed his surveillance position and reinitiated mobile surveillance. (Ardell Aff. ¶ 6.)

At approximately 5:45 a.m. on July 8, Maine State Police were running radar on Route 1 in Monticello, Maine. (Harris Aff. ¶ 2.) Trooper Chad Fuller had been called in to assist ICE with its efforts to stop the vehicles in question. Trooper Brian Harris, also called to assist, observed a tan Ford Taurus traveling southbound on Route 1, followed closely by a tan minivan. Trooper Harris activated his radar and clocked the lead vehicle's speed as 36-38 mph. The minivan was also traveling the same speed and was only 1 to 2 car lengths behind. Trooper Harris pulled out behind the minivan; he then activated his emergency lights, went around the minivan, and stopped the Taurus. Trooper Fuller stopped the minivan. (Id. ¶ 3.)

Trooper Harris approached the driver's side of the Taurus and could see a single male occupant/driver in the vehicle. Trooper Harris asked the driver for his license, registration and insurance and received an insurance card and a New Brunswick picture license in response. From the license Trooper Harris identified the operator as Steve G.

Bouchard, DOB 11-03-71, of St. Joseph, New Brunswick. Trooper Harris noticed that the insurance card was issued to Martin Ford in Fort Kent. (Id. ¶ 4.)

While speaking to Bouchard, Trooper Harris noticed numerous apparently empty soda cans and a large amount of trash on the front passenger floorboard. Trooper Harris could also see a shirt hanging in the driver's side rear window and a black duffel bag on the back seat. Trooper Harris told Bouchard that Trooper Harris had stopped him for doing 38 mph in a 30 mph zone. Trooper Harris returned to his cruiser and wrote out a warning card for speeding for Bouchard and then returned to Bouchard's car. (Id. ¶ 5.) During the stop, Bouchard told Harris that he did not know which rental business the rental vehicle had come from. (Id. ¶ 4.)

When Harris returned to the vehicle he asked Bouchard twice if he could search the interior of his vehicle. It is Trooper Harris's practice to always ask twice in order to insure that he has obtained a consent to search. Bouchard indicated that Harris could search the interior of the car. Harris did not notice that Bouchard had any particular accent or difficulty with English and believed that he sounded like any other French speaker from Canada. Bouchard got out of the car at the trooper's direction. (Id. ¶ 5.) Once out of the car Trooper Harris directed Bouchard to the side of the road, away from traffic and asked him to sit on the grass. (Id.) Trooper Harris then proceeded to search the interior of the car. In his search, Trooper Harris located a black duffel bag on the back seat. Trooper Harris then looked inside the bag and saw a minimal amount of clothes but no toiletries or shoes. In the front zippered part of the outside of the bag Trooper Harris noticed that there were several small bundles of different colored "zip ties." On the front passenger seat floorboard there were numerous empty Pepsi soda

7

cans, paper cups, cigarette packages and assorted trash, enough trash that the floorboard was not visible.

The Ford Taurus model in question has rear seats that flip forward to provide access to the trunk of the car. As Trooper Harris was searching the rear passenger area of the vehicle he noticed that the pull-tabs for the rear seat backs were visible and he pulled on the tabs to look behind the seat. When the seat back was pulled forward, Trooper Harris immediately noticed a large black nylon bag behind the seat and the bag appeared to be full. (Id. ¶ 7.) Trooper Harris then asked Bouchard about the bag and Bouchard acted confused. The seeming confusion was not related to the English conversation, but to the presence of the black bag in the trunk. Bouchard said the bags in the trunk were not his and that he would not give Trooper Harris permission to search the trunk. Trooper Harris then used the key to open the trunk and upon doing so immediately noticed more black nylon duffel bags in the trunk, filling the trunk compartment. (Id.) At that point Trooper Harris ended his search of the vehicle.

Trooper Harris then communicated with Special Agent Mark Sperry of MDEA and told him about the black hockey bags with colored ties that Trooper Harris had seen in the trunk. The bags were suspicious to Special Agent Sperry because of a previous marijuana seizure where the marijuana was packaged in hockey bags and colored ties were used to seal the bags. Special Agent Daniel Sanchez then arrived on the scene and he was informed of the hockey bags with the colored ties. Special Agent Sanchez agreed that the presence of the hockey bags with colored ties was significant evidence of drug trafficking. Special Agent Sanchez opened one of the bags and found a large amount of marijuana inside.

Meanwhile, Trooper Fuller was attending to the minivan. Trooper Fuller activated his emergency lights and the van pulled over. Trooper Fuller went up to the driver side window and observed that the vehicle had only one occupant. Trooper Fuller asked to see his license, registration and proof of insurance. The operator gave Trooper Fuller his license and proof of insurance. The operator was Leo Roussel, who produced a New Brunswick license #694436, DOB August 4, 1962. Like the Taurus, the van was a rental vehicle registered to Martin Ford in Fort Kent. (Fuller Aff. ¶ 4.) Trooper Fuller observed Roussel's hands shaking and heart racing, which Trooper Fuller could see through his shirt, and that Roussel was watching the vehicle ahead of them, which Trooper Harris had stopped. Trooper Fuller did not issue a warning card for either speeding or following too closely to Roussel, although he says he stopped the vehicle for those traffic violations.

Trooper Fuller conducted a search of the van. He says he asked Roussel if he could search the van and that Roussel consented. In the back seat was a duffel bag and in the very back was something that was covered with two blankets. Trooper Fuller opened the back hatch of the van and lifted the blankets. Underneath the blankets were what appeared to be large black hockey style duffel bags with wire ties attaching the handles, and a glue or silicon type substance where the zipper was closed and extending about 3 inches down the zipper. The bags appeared to be full. Trooper Fuller looked on one end of the bag where there was a vent hole and could see a clear plastic bag with what appeared to be Marijuana in it. (Fuller Aff. ¶ 7.) Trooper Fuller then turned everything over to Bruce Gauthier, an Immigration & Customs Enforcement Agent who had arrived on the scene.

Although Trooper Fuller says that Roussel had no language problems that he could discern, the evidence at the hearing suggests that Roussel's English is rather limited. Leon Ives, an officer who participated in the debriefing of both Bouchard and Roussel provided persuasive evidence about the language abilities of the two men. Ives said that his conversation with Bouchard was 90% in English and that Bouchard could understand most of what was said in English, although Royal Canadian Mounted Police (RCMP) Constable Rick Barnard was present to assist with interpretation. Ives's description of Bouchard's ability to understand English comports with the evidence from the scene of the search. When Trooper Harris sought consent to search the bags in the trunk Bouchard clearly withdrew his consent to search. In my view that action corroborates Harris's earlier testimony that after being asked twice Bouchard twice indicated he consented to a search of the interior passenger compartment (where there was no marijuana). I am satisfied that Harris's search of the passenger compartment, including the discovery of the bags behind the seat and the "zip ties" in the bag in the passenger compartment, was undertaken with Bouchard's consent.

Roussel's ability to speak English was definitely less than Bouchard's. As Ives describes it only about 10% of his conversation with Roussel was in English, exactly the converse of his experience with Bouchard. In French, Roussel first explained that he had found the marijuana alongside the road and had intended to deliver it to the police. RCMP Constable Barnard played a much more active part in this conversation while functioning as the interpreter. At one point when Ives questioned Roussel in English if he thought the matter was funny, Roussel did respond, "No," or perhaps, "Non." Ives took this to mean that Roussel had fully understood his question. Ives also testified that

later in their conversation Roussel's command of English was such that he was able to provide nouns and adjectives to describe an aluminum boat powered by a small motor that brought the marijuana across the river. Ives "felt Roussel could both speak and understand some basic English."

Elizabeth Ramirez, a teacher at Husson College who specializes in teaching English to speakers of other languages, was retained to test Roussel's English proficiency. Her assessment, which I believe is corroborated by the testimony of both Ives and the various family members who testified regarding Roussel's ability to communicate in English, was that Roussel functioned at a beginner's level and did not approach fluency. Of course, his vocabulary contains certain basic English words and he is able to recognize English-French cognates (English words which look like, sound like and share some or all of the meanings as their French counterparts, e.g., "communication") and place them in context. Roussel was able to say, "No understand," in English when he failed to grasp the significance of what Ramirez said. In the context of his conversation with Trooper Fuller, I am not fully persuaded that Roussel understood that Trooper Fuller was seeking his consent as opposed to announcing that he would search the vehicle.

### Discussion

The First Circuit has recently summarized the law applicable to the warrantless search of a motor vehicle:

> The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Subject to limited exceptions, warrantless searches of private property are per se unreasonable. The mobility of automobiles and the attendant need to prevent loss of evidence undergirds one such exception. A warrantless

> search of an automobile will be upheld if officers have probable cause to believe that the vehicle contains contraband.
>
> The government bears the burden of proving the lawfulness of the search. Specifically, the government must demonstrate that law enforcement officers had a belief, reasonably arising out of circumstances known to the seizing officer, that the vehicle contained that which by law is subject to seizure and destruction. Our focus is on what the agents knew at the time they searched the car.

United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004) (internal quotation marks, citation and footnote omitted).

To analyze whether probable cause existed to search these vehicles, the court must apply the "fellow-officer" rule. As the First Circuit recognized in United States v. Meade, under the "fellow-officer" rule, law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime. 110 F.3d 190, 193-94 (1st Cir. 1997); see also United States v. Ventresca 380 U.S. 102, 111 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.").

Collectively, the officers knew the following prior to the searches of the vehicles:

- The two vehicles were rental vehicles from a Fort Kent automobile dealership;
- The occupant of each vehicle was seen at the Gateway Motel in Madawaska;
- A confidential informant had informed the officers that Canadians who were smuggling marijuana across the border were renting cars in Fort Kent and staying in a motel in Madawaska;
- The vehicles were traveling together;

12

- The vehicles traveled to the border near a known marijuana smuggling point at 1:00 a.m.;
- A prior case involving marijuana smuggling at that same location had involved a large quantity of marijuana concealed in a duffel bag;
- The vehicles apparently remained near the smuggling point for approximately three hours during the early morning hours (1:00 - 4:10 a.m.);
- After stopping the vehicles they learned the sole occupant of each vehicle was a Canadian citizen who, whether for language barrier reasons or because he was being evasive, could not provide reliable information about how he came to have custody of the rental car;
- While conducting the traffic stop Trooper Harris saw a black duffel bag on the back seat of the Taurus.

Given these facts known collectively to the officers involved in this matter, the officers had probable cause both to stop and ultimately to search these vehicles. As a preliminary matter, the officers clearly had probable cause to stop these vehicles for a traffic violation because they were operating in tandem and in excess of the posted speed limit. The defendants do not challenge that assertion. That the stop was pretextual seems patently obvious, but the officers' subjective motivations are irrelevant. Whren v. United States, 517 U.S. 806, 813 (1996). Because the defendants' speed provided cause for the traffic stops, "the inquiry stops there." United States v. Andrade, 94 F.3d 9, 12 (1st Cir. 1996). See also United States v. Abernathy, 83 F.3d 17, 19 (1st Cir.1996) (officers on undercover investigatory narcotics detail may lawfully make a traffic violation stop).

Because the stops were valid traffic stops, observations made by the officers while they completed their initial inquiries to prepare the warning cards for the speeding infractions are properly part of the probable cause calculus. The totality of the circumstances would have led any reasonable person to believe that criminal activity was afoot. The officers had received information from an informant that was corroborated by the events they saw unfolding in front of them. Two Canadian men with rental cars staying at the Gateway Motel proceed to a known drug smuggling point in the middle of the night. They apparently remain somewhere in the vicinity of that drug smuggling location (a desolate location on the banks of the St. John River) for approximately three hours. They then proceed south, traveling in tandem, for approximately 60 miles. After the vehicles are stopped, one of the operators appeared visibly unnerved. In the other vehicle the officer saw a black duffel bag sitting on the back seat. When all of these facts are taken together, the totality of the circumstances supports a finding that the officers had probable cause to believe that the vehicles in question contained contraband. Having probable cause to search the vehicles for contraband, the Troopers were permitted to conduct "probing searches" of both vehicles and the containers inside them. United States v. Ross, 456 U.S. 798, 800, 825 (1982).

Even if the court concludes that the Troopers did not have probable cause to search the vehicles based exclusively on the circumstances as they existed prior to the consent search of Bouchard's vehicle, probable cause is clearly made out once the court factors in the colored zip ties and the large hockey bag that Trooper Harris discovered pursuant to that search, because that evidence corresponded with the information law enforcement officers had about the *modus operandi* of past drug trafficking involving the

14

very same border location where these two vehicles had been observed that morning. Cf. Ker v. California, 374 U.S. 23, 34-36 (1963) (holding that an arrest was supported by probable cause where the officers did not observe a drug transaction, but observed lawful conduct that was consistent with the manner in which a drug transaction transpired the day before). Also adding to the probable cause matrix was the fact that Bouchard attempted to disavow any possessory interest in the hockey bag. By that juncture, Bouchard's withdrawal of consent could not have prevented a search from taking place because probable cause was well established.

As for the search of Roussel's vehicle, I conclude that the lack of meaningful consent to search the minivan is a red herring. The lawful discovery of marijuana in Bouchard's car provided ample probable cause to search Roussel's vehicle in light of the fact that the vehicles had departed from the same location earlier that morning, had traveled together to the suspicious border location at 606 Main Street, and had continued to travel as a convoy throughout the morning.

## Conclusion

Based upon the foregoing I **RECOMMEND** that the court **DENY** the motions to suppress (Docket Nos. 26 & 27).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

15

       Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

                                              /s/ Margaret J. Kravchuk
                                              U.S. Magistrate Judge

Dated: April 1, 2005